**ALLIED OFFICE SUPPLIES INC., Plaintiff,**

v.

**Allen LEWANDOWSKI, Jonathan Cox, and W.B. Mason Co., Inc., Defendants.**

**No. 3:03CV367 (JBA).**

United States District Court, D. Connecticut.

May 5, 2003.

Deborah S. Freeman, Nicole J. Anker, Bingham McCutchen, Hartford, CT,

Lynne Anne Anderson, William R. Horwitz, Sills, Cummis, Radin, Tischman, Epstein & Gross, Newark, NJ, for plaintiff.

Thomas J. Riley, Tobin, Carberry, O'Malley, Riley & Selinger, New London, CT, Deborah L. Thaxter, Stephen W. Rider, Noxon Peabody, Boston, MA, for defendants.

### RULING ON PLAINTIFF'S MOTION FOR TEMPORARY RESTRAINING ORDER AFTER HEARING [DOC. # 11]

ARTERTON, District Judge.

Plaintiff Allied Office Supplies, Inc. ("Allied") brings this suit against its former employees, defendants Jonathan Cox and Allen Lewandowski,[1] and defendant W.B. Mason Company, Inc. ("Mason"), one of Allied's competitors in the office supply business, alleging generally that Cox and Lewandowski breached the restrictive covenants in their employment agreements with Allied and that all three defendants tortiously interfered with Allied's contractual and business relationships. On April 21, 22, 28, and 29 of 2003, the Court heard evidence on Allied's motion for temporary restraining order ("TRO") [Doc. # 11]. By consent of the parties, the scope of the hearing was limited to Allied's request for injunctive relief from alleged ongoing breaches by Cox and Lewandowski of the contractual non-solicitation covenants. For the reasons set forth below, Allied's motion [Doc. # 11] is DENIED.

1. The Court previously dismissed all claims against Todd Sage, also a former employee of Allied, under Fed.R.Civ.P. 12(b)(6).

2. The Second Circuit has never applied a different standard for a temporary restraining order than for a preliminary injunction, and district courts have assumed them to be the same. *See e.g., Jackson v. Johnson,* 962 F.Supp. 391, 392–93 (S.D.N.Y.1997).

### I. Standard for TRO

"To obtain a preliminary injunction, a plaintiff must show a threat of irreparable injury and either (1) a probability of success on the merits or (2) sufficiently serious questions going to the merits of the claims to make them a fair ground of litigation, and a balance of hardships tipping decidedly in favor of the moving party." *Motorola Credit Corp. v. Uzan,* 322 F.3d 130, 135 (2d Cir.2003)(quotation omitted).[2] The Court's ruling denying plaintiff's preliminary relief rests on Allied's failure to show a probability of success on the merits or sufficiently serious questions going to the merits of its breach of contract claims, and therefore does not reach irreparable injury and/or balance of hardships.

### II. Introduction and Factual Background [3]

The sole basis for the Court's decision is the conclusion that the evidence adduced at the hearings failed to demonstrate that Cox and Lewandowski ever assented to the employment agreement Allied now seeks to enforce against them, and thus Allied, having failed to demonstrate the formation of a contract, has not shown a likelihood of success on (or sufficiently serious questions going to) the merits of its breach of contract claims.[4] Accordingly, the following factual background focuses

3. Factual conclusions in this ruling are either undisputed or represent the Court's Fed. R.Civ.P. 52(a) factual findings based on the record established at the hearings on Allied's Motion.

4. The Court's conclusion is based on the evidence presented at the hearing for purposes of ruling on Allied's motion for TRO, and does not predetermine final determinations based on a full trial record.

narrowly on the evidence bearing on the formation of an employment contract between Cox and Lewandowski and Allied and any necessary background thereto.

The non-solicitation contracts which plaintiff seeks to enforce are claimed to have been executed in connection with the acquisition of Harrison Office Products, Inc. ("Harrison") by Allied on October 30, 1998. Harrison was owned by William Borbely, and its sales personnel included long time employees Sage, Cox, and Lewandowski. At Harrison, Sage had been Cox's and Lewandowski's supervisor for several years prior to the acquisition when all three became Allied employees. Harrison had not required its employees to sign any employment agreements.

As part of the acquisition, Allied demanded that a sufficient number of Harrison's then current sales personnel agree to continue in the employ of Allied and do so pursuant to the terms of employment agreements that included, among other provisions, non-solicitation covenants. Harold Brown, CEO and president of Allied, and Borbely agreed to have Sage act as agent for both Harrison and Allied in connection with obtaining approval of finalized employment agreements from Harrison's sales people. After discussions with Sage and relying on his explanation that this agreement was protective of their interests in the acquisition, Lewandowski on October 14, 1998 and Cox on October 15, 1998 signed employment agreements with Harrison (the "Harrison Agreement").

The Harrison Agreement includes the following: 1) the Harrison logo and, although not precisely worded, terms indicating that the agreement is between the signing employee and Harrison; 2) the terms requiring the signing employee to agree "for a period of one year after ... termination ... with Harrison ... not [to] solicit ... any customers of Harrison"; 3)

signature lines on the bottom of the last page of text; and 4) a one page addendum providing for nullification of the restrictions upon the happening of certain events and also containing signature lines.

For some reason not explained by the evidence so far, less than two weeks later and just days prior to the closing, Allied sought to obtain the sales peoples' signature on a second employment agreement that named Allied as employer (the "Allied Agreement"). The Allied Agreement includes the following: 1) the first page captioned "Employment Agreement" bears Allied's name and terms stating that the agreement is "by and between Allied ... its affiliates, subsidiaries or subdivisions ... and [signing employee]"; 2) a non-solicitation covenant by which the signing employee agrees not to solicit "for a period of eighteen months from ... termination ... any past or current customer of [Allied and its affiliates, subsidiaries, or subdivisions]"; 3) three pages of text extending roughly one-quarter down the third page ending with "(Signature Page Follows)"; 4) a fourth unnumbered signature page containing signature lines for Allied and the signing employee and headed by one sentence, which reads, "IN WITNESS WHEREOF, the parties have caused this Agreement to be executed on the date first above written."; 5) a fifth page, also not numbered, is captioned "RE: ADDENDUM TO EMPLOYMENT AGREEMENT BY AND BETWEEN ALLIED OFFICE SUPPLIES, INC. AND [EMPLOYEE] DATED AS OF OCTOBER 29, 1998," contains a half page of text (including a provision under which, upon certain triggering events, the employee was not bound by the agreement with respect to customers to whom the employee made sales and for which the employee derived a commission payment from the Company during the six month period prior to such

termination), and ends with "(Signature Page Follows)"; and 6) a sixth unnumbered page identical to the page four signature page.

It is undisputed that earlier in the week of the closing consummating Allied's acquisition of Harrison, both Cox and Lewandowski signed signature pages identical to pages four and six of the Allied Agreement and that Sage signed on Allied's signature line. Allied contends that the pages both defendants signed were attached to an Allied Agreement which defendants read or should have read. As evidence, Allied points to: 1) the signature pages themselves; 2) the testimony of Diane Gardiner, a co-worker of Sage, Cox, and Lewandowski at Harrison, that she received a copy of a complete Allied Agreement in mid to late October of 1998, read it, had an attorney review it, and signed and dated it October 27, 1998;[5] 3) the resignation letters of Cox and Lewandowski dated January 31, 2003, both referencing their Allied employment agreements; and 4) Cox's admission in deposition read into the record at the hearing that he had read, signed, and returned the addendum of an Allied Agreement to Sage in October of 1998.

Sage, Cox and Lewandowski, now employed by defendant Mason with the latter two actively soliciting most of their former Allied customers, explained why they never read the Allied Agreements. Cox, who testified first, identified his signatures on pages four and six of an Allied Agreement, but steadfastly maintained that he has no recollection of ever signing any agreement other than an agreement containing a one year restrictive covenant (which is the limitation in the Harrison Agreement). To explain his inconsistent deposition testimony and reference in his letter of resignation to the Allied Agreement as the opera-

tive agreement, Cox testified that he had requested a copy of his agreement from Allied's Hartford office manage, Tara Drost, to give to Mason, at its request, and Drost supplied him with only a copy of the Allied Agreement although both the Harrison Agreement and the Allied Agreement were in his personnel file. Without reading it, Cox forwarded a copy of the Allied Agreement to Mason, who apparently prepared Cox's resignation letter. He claims that it was only when shown the Harrison Agreement after his deposition that he realized there were two agreements bearing his signatures, and his admitted recollection of reading and signing applied only to the Harrison Agreement. He also testified that he never read the Allied Agreement until after suit was commenced against him.

Lewandowski, testifying after hearing Cox's testimony, claimed a firmer recollection. He recalls discussing the Harrison agreement with Sage, and reading and signing it in midOctober 1998. He remembers that later in October Sage came to him with signature pages bearing Allied's name and asking Lewandowski to sign them. With the understanding that the agreement to which the signature pages referred was the same as the Harrison Agreement and having been assured by Sage that the new pages were merely a formality for sake of closing the sale of Harrison, Lewandowski signed the signature pages. His explanation for his reference in his resignation letter to the Allied Agreement is the same as that of Cox's.

Finally, Sage, present (initially as a defendant and then as Mason's representative) throughout and the last witness at the hearing, claimed very firm memory regarding the events surrounding Cox's and

---

**5.** Gardiner testified she had no knowledge about whether defendants had signed the Allied Agreement or any surrounding circumstances.

Lewandowski's signing of Harrison Agreements and pages four and six of Allied Agreements. Sage specifically recalls being present when Cox and Lewandowski signed their Harrison Agreements. Sage testified that, during the "fire drill" of the week before the closing, Sage received a package from Allied's counsel Joseph Becht of Sills Cummis, (Radin, Tischman, Epstein & Gross) containing signature pages for Allied Agreements which were not attached to the text of Allied Agreements. As it was so close to the closing, he gathered as many sales people together as he could, including Cox and Lewandowski, told them they needed to sign the signature pages for the closing to go through and represented that the agreement referred to in the signature pages was the same as the Harrison Agreement, just transformed nominally to Allied Office Supplies. According to Sage, Cox and Lewandowski signed. In actuality, there are significant differences in material terms of the Harrison and Allied Agreements.

## III. Discussion

 The rules of contract formation are well settled in Connecticut:

> To form a valid and binding contract in Connecticut, there must be a mutual understanding of the terms that are definite and certain between the parties. To constitute an offer and acceptance sufficient to create an enforceable contract, each must be found to have been based on an identical understanding by the parties. If the minds of the parties have not truly met, no enforceable contract exists.

*L & R Realty v. Connecticut Nat'l Bank,* 53 Conn.App. 524, 534–35, 732 A.2d 181 (1999)(quotations and citations omitted). The evidence adduced at the hearing does not provide a basis for concluding that there are "serious questions" going to the merits regarding whether the Allied Agreement, with terms different from the Harrison Agreement, was a contract to which Cox and Lewandowski assented by their signatures.

Both readily admitted that they read, understood, discussed, and ultimately agreed to the terms of the Harrison Agreement. However, Lewandowski testified that he was only presented with the signature pages of the Allied agreement and signed them with the understanding that it was identical to the Harrison Agreement based on Sage's representations that it was a mere formality required as part of the acquisition of Harrison. Cox, while having no memory of signing the Allied Agreement (despite acknowledging his signature on two of its pages), does remember signing his Harrison Agreement. Sage testified that he put the signature pages of an Allied Agreement in front of both Lewandowski and Cox with the representations that they needed to sign the signature pages in order for the closing to go through and that the Allied Agreement was the same as the Harrison Agreement save for the name change. He further testified that Lewandowski and Cox then signed. On this uncontradicted testimony, there is no basis for concluding that Cox or Lewandowski assented to the materially different terms of the Allied Agreement, i.e. lengthening the non-solicitation period by six months and broadening the potential customer base covered by the non-solicitation covenants.

Although Cox admitted (in deposition testimony offered as substantive evidence under Fed.R.Evid. 801(d)(1)(A)) that he read and signed the addendum to the Allied Agreement in 1998, he provided a plausible and uncontradicted explanation for his mis-statement. The same explanation similarly covers both Cox's and Le-

wandowski's admissions in their resignation letters.

Further, while Gardiner somehow obtained a full copy of her Allied Agreement with sufficient time for review by her lawyer, she testified that she had no knowledge of how Cox and Lewandowski went about signing Allied Agreements, if at all. Allied's other witnesses provided no evidence of contract formation: Brown admitted that, other than discussing business aspects of the agreements with Borbely, he had no direct involvement with the details of obtaining agreements from the Harrison sales force. Thomas Mayfield, a co-worker of Sage, Cox, and Lewandowski at Harrison and Allied, was also called but no testimony was elicited from him regarding his or anyone else's execution of either the Harrison or Allied Agreements. Finally, Allied did not call Ken Fischer, the one individual who, due to his direct communication with Sage regarding the agreements and the acquisition, would be in a position to rebut some of Sage's testimony about Allied's representations that the Allied contract was the same as the Harrison Agreement.

Thus, the only probative testimony of persons with personal knowledge about the circumstances of defendants' signing the Allied Agreements was from the defendants themselves. Despite obvious bias and interest, the structure of the Allied Agreement itself supports the plausibility of their testimony. The Allied Agreement's signature pages are freestanding with no spillover from the body of either the text or addendum even though there was ample room on both pages three and five to add signature lines; neither the addendum nor the three pages of the body of the agreement provides for individualized initialing; the signature pages do not include language describing the agreement and reciting that the signatory swears to have read it; and the acts (and circumstances) of defendants' signing was not witnessed or otherwise memorialized.

■ Allied strenuously contends that the signature pages themselves invoke the "duty to read rule" which in turn requires enforcement of the Allied Agreements against Cox and Lewandowski. The duty to read rule derives from the objective theory of contracts, under which one party to a contract must be permitted to rely on the manifested assent demonstrated by the other party's signature (or action) without fear that the latter may subsequently void the contract by claiming failure to read or understand. *See generally* 7 Perillo, Joseph M., Corbin on Contracts §§ 29.8–29.12 (Rev. ed.2002). Connecticut has long endorsed this rule:

> The general rule is that where a person of mature years and who can read and write, signs or accepts a formal written contract affecting his pecuniary interests, it is his duty to read it and notice of its contents will be imputed to him if he negligently fails to do so; but this rule is subject to qualifications, including intervention of fraud or artifice, or mistake not due to negligence, and applies only if nothing has been said or done to mislead the person sought to be charged or to put a man of reasonable business prudence off his guard in the matter.

*Ursini v. Goldman,* 118 Conn. 554, 562, 173 A. 789 (1934). Whether or not this rule is applicable here is debatable as it presupposes either that the alleged breaching party was provided with the entirety of the allegedly breached agreement (contrary to the evidence so far), or that because the signature pages made explicit reference to an agreement, defendants were put under a derivative duty of inquiry into the contents of the referenced writing. Even if the rule applies to the facts of this case, the exception to the rule

would discharge both Cox's and Lewandowski's duty to read or request the full Allied Agreement. Here the testimonial evidence was that Cox and Lewandowski relied on the representations of Sage, their supervisor with whom they shared a long, amicable, and trusting relationship, who would move with them to Allied and was, as admitted by Allied's CEO Brown, authorized to act as Allied's agent in securing the agreements. They plausibly would have been put off their guard when Sage merely provided signature pages as a formality coupled with the representation that the referenced agreement was identical to the one they had signed just two weeks prior after specific consultation with Sage. *See generally, Ursini,* 118 Conn. at 562, 173 A. 789 (jury entitled to conclude that broker's representations excused plaintiff's duty to read insurance contract); *First Charter Nat'l Bank v. Ross,* 29 Conn. App. 667, 671, 617 A.2d 909 (1992)(duty to read excused where husband presented wife with signature pages on top of a guarantee and mortgage and misrepresented to her the contents of the underlying documents); *DiUlio v. Goulet,* 2 Conn. App. 701, 483 A.2d 1099 (1984); *Goldstein v. Allstate Ins. Co.,* No. 64233, 1993 WL 213711, at *2–3 (Conn.Super. June 8, 1993)(genuine issue of material fact regarding whether plaintiff excused from duty to read where plaintiff's affidavit claimed defendant's agent had represented new policy had same scope of coverage as old). In the absence of contrary evidence, Allied's motion for TRO after hearing is DENIED [Doc. # 11] for the reasons set forth above.

IT IS SO ORDERED.