# IN THE COURT OF CHANCERY OF THE STATE OF DELAWARE

| | | |
|---|---|---|
| BRAGA INVESTMENT & ADVISORY, LLC, | ) ) ) | |
| Plaintiff, | ) ) | |
| v. | ) ) | C.A. No. 2019-0408-PAF |
| MUSA YENNI, YENNI INCOME OPPORTUNITIES FUND I, L.P., STEVEN FELLER P.E., LLC, | ) ) ) ) ) | |
| Defendants. | ) ) | |

## MEMORANDUM OPINION

Date Submitted: February 8, 2023
Date Decided: May 31, 2023

Blake Rohrbacher, Andrew L. Milam, RICHARDS, LAYTON & FINGER, P.A., Wilmington, Delaware; David Lackowitz, Alexandra Kolod, MOSES & SINGER LLP, New York, New York; *Attorneys for Plaintiff Braga Investment & Advisory, LLC.*

Julia B. Klein, KLEIN LLC, Wilmington, Delaware; Justin S. Stern, FRIGON MAHER & STERN LLP, New York, New York; *Attorneys for Defendants Musa Yenni, Yenni Income Opportunities Fund I, L.P.*

Francis G.X. Pileggi, Cheneise V. Wright, LEWIS BRISBOIS BISGAARD & SMITH LLP, Wilmington, Delaware; *Attorneys for Steven Feller P.E., LLC.*

**FIORAVANTI, Vice Chancellor**

In 2016, Braga Investment & Advisory, LLC ("Braga Investment" or "Plaintiff") invested $700,000 to acquire a 23.3% membership interest in Steven Feller P.E., LLC (the "Company" or "Newco"), as part of a transaction in which the Company acquired the business of Steven Feller P.E., PL. Yenni Income Opportunities Fund, I, L.P. (the "Fund") and its managing partner, Musa Yenni ("Yenni"), engineered the deal. The Fund owned a majority of the Company's membership interests and became the Company's managing member.

Among the materials that Braga Investment received in due diligence was an unsigned, proposed form of the Company's limited liability company agreement, which is referred to as the operating agreement. Braga Investment knew that the proposed operating agreement would be revised before the closing of the transaction. Braga Investment even received one of the invoices from the lawyers who prepared those revisions, and it paid the bill. After that, Braga Investment executed and returned a signature page to the operating agreement. Before executing and returning the signature page, Braga Investment never asked to see the final operating agreement.[1]

---

[1] The trial testimony is cited as "Tr."; deposition testimony is cited as "Dep."; trial exhibits are cited as "JX"; stipulated facts in the pre-trial order are cited as "PTO"; and references to the docket are cited as "Dkt.," with each followed by the relevant section, page, paragraph, exhibit, or docket number. The trial record includes over 71 exhibits, live trial testimony from 3 witnesses, and 9 deposition transcripts.

As part of the terms of its investment in the Company, Braga Investment also entered into a separate agreement with the Fund. In that agreement, Braga Investment acknowledged that it was a passive investor and gave the Fund an irrevocable power of attorney, allowing it to "vote [Braga Investment's] equity interest in [the Company] . . . at all meetings of equity holders and for any other purpose equity owners are called to vote or consent."[2]

After disputes later arose between Braga Investment and the Fund, the Fund sought to amend the operating agreement in connection with a potential debt refinancing in May 2019. In that process, Braga Investment discerned that the existing operating agreement materially differed in certain respects from the proposed form of the operating agreement that it first received in 2016. On May 31, 2019, the Company and its members adopted an amended operating agreement, with the Fund signing on behalf of Braga Investment under the irrevocable power of attorney.

In this action, Braga Investment alleges that the Fund and Yenni fraudulently induced Braga Investment to invest in the Company in 2016 and that they breached the operating agreement by purporting to amend it twice without Braga Investment's authorization. Braga Investment seeks rescission and a return of its original

---

[2] JX 5 ("Co-Investment Agreement") § 5.

2

investment or, alternatively, damages and an order declaring that the form of operating agreement that it first received in August 2016 is the Company's "valid and effective" operating agreement.

In this post-trial decision, the court concludes that Braga Investment failed to establish its claims. Accordingly, judgment is entered in favor of the defendants. The defendants' application for an award of its attorneys' fees and expenses, however, is denied.

## I. BACKGROUND

The following recitation reflects the facts as the court finds them after trial.

### A. The Players

The Fund is a Delaware limited partnership and private equity fund.[3] Musa Yenni is the Fund's managing partner.[4] The Fund created the Company in October 2015 to facilitate the acquisition of the assets that made up the business of Steven Feller P.E., PL ("Oldco"),[5] an engineering firm owned by Steven Feller and Louise Feller (together, the "Sellers").[6] On or about November 16, 2015, the Fund entered

---

[3] PTO ¶ 14; Tr. 292:3–5 (Yenni).

[4] PTO ¶ 15.

[5] *See* JX 18 YENNI0046682; Tr. 293:12–294:4 (Yenni).

[6] Tr. 73:13–15 (Ricardo); *id.* 16:8–16:l5 (Ricardo); PTO ¶ 17.

into a Membership Interest Purchase Agreement (the "Purchase Agreement") with the Sellers and Oldco.[7] The transaction did not close until ten months later.[8]

Braga Investment is a Delaware limited liability company headquartered in New York, New York.[9] Ricardo Braga has served as Braga Investment's managing member since 2011. Ricardo Braga's son, Rodrigo Braga, has served as a director and member of Braga Investment since 2015.[10]

In August 2016, the Fund presented Braga Investment with an opportunity to invest in the Company.[11] At this point, the transaction contemplated by the Purchase Agreement had not yet closed. Braga Investment expressed interest in the opportunity and began due diligence.[12] On August 26, 2016, Yenni sent an email to Braga Investment attaching a copy of the Purchase Agreement. The text of the email stated in pertinent part:

> Here is the definitive purchase agreement we executed with the Seller in November both with and without all its exhibits. The purchase agreement without the exhibits has the signatures of the parties. Please note that Section 9 of the Operating Agreement (Exhibit D) addresses the issues of transfer of shares for all members. We could specify in

---

[7] PTO ¶ 17.

[8] *Id*.

[9] *Id*. ¶ 13.

[10] Tr. 5:13–22 (Ricardo); *id*. 8:1 (Ricardo); *id*. 250:19–21 (Rodrigo). For clarity, this opinion refers to Ricardo Braga and Rodrigo Braga by their first names. No familiarity or disrespect is intended.

[11] PTO ¶ 18.

[12] Tr. 297:24–298:6 (Yenni).

our operating agreement that we would abide by this Exhibit D.  We look forward to our likely partnership.[13]

The operating agreement attached as Exhibit D to the Purchase Agreement (the "2015 OA" or "2015 Operating Agreement")[14] was unsigned and undated. Unsurprisingly, the 2015 OA did not refer to Braga Investment, which only arrived on the scene in August 2016, ten months after the Fund, Sellers, and Oldco had executed the Purchase Agreement.  Thus, there was no signature block for Braga Investment to sign on the 2015 OA's signature page.[15]  Schedule A to 2015 OA ("2015 Schedule A"), which set out the members and managers of the Company's capital accounts, had blanks where the dollar amount of the capital account should have been and did not provide a line for Braga Investment.[16]  It did, however, provide lines for the Fund and Oldco.[17]

## B.    The Co-Investment Agreement

After receiving the August 26, 2016, email, Braga Investment began conducting due diligence.  On September 2, 2016, Braga Investment and the Fund held a due diligence conference call.  Ricardo created a seven-page list of talking

---

[13] JX 2 at BRAGA00011046.  The parties understood that the lowercase "operating agreement" refers to a separate agreement between the Fund and Braga Investment that would come to be known as the Co-Investment Agreement.  Tr. 13:5–20 (Ricardo).

[14] JX 2 at BRAGA00011047.

[15] *Id.* at BRAGA00011249–50.

[16] *Id.* at BRAGA00011256.

[17] *Id.*

points for the conference call. One point stated, "Management fees schedule has to be amended in operating agreement to match requirements by lenders."[18] Another bullet point stated: "Outline of operating agreements, included in current one or just between us and Yenni Fund[.] Might go against operating agreements."[19] Ricardo and Yenni also discussed Braga Investment's desire for a seat on the Company's board of managers (the "Board").[20] The Fund declined that request but offered to give Braga Investment board observer rights.

Following the conference call, the Fund made various changes to a co-investment agreement (the "Co-Investment Agreement").[21] In an email enclosing the revised Co-Investment Agreement, Yenni stated, "Thank you for our call today. Please find attached a redlined copy of our agreement reflecting the changes we agreed to and a pdf copy with my signature. Ricardo: please sign and email back to us today."[22] Ricardo signed and returned the executed Co-Investment Agreement later that day.[23]

---

[18] JX 3 at BRAGA00000956; Tr. 102:14–103:5 (Ricardo).

[19] JX 3 at BRAGA00000957.

[20] Tr. 19:11–20:12 (Ricardo).

[21] JX 4 at BRAGA00034050.

[22] *Id.*

[23] *Id.*

The Co-Investment Agreement provided that Braga Investment would purchase 23.3% of the equity of Newco for $700,000.[24] It also contained a representation that Braga Investment entered into the agreement on an informed basis stating that:

> [Braga Investment] reviewed with its counsel, or has had the opportunity to do so, the diligence material made available to it by Newco and the Managing Investor and the [Membership Interest Purchase Agreement dated as of November 16, 2015 (the "PA")] and has agreed to enter into a so-called Joinder Agreement pursuant to which it shall be deemed to be a Buyer under the PA and will be entitled to all of the rights and subject to all of the obligations described in the PA, including but not limited to the Operating Agreement of Newco and the other Exhibits referenced therein.[25]

The Co-Investment Agreement also recites that:

> [Braga Investment] intends to be a passive investor in Newco but shall be granted Board of Managers ("Board") observer rights in which capacity it shall receive copies of all Board packages prepared for Board members concurrent with receipt thereof by all Board members and shall be reimbursed all travel and related expenses in accordance with Company policy.[26]

Reflecting the passive nature of Braga Investment's investment, the Co-Investment Agreement also granted the Fund "the right to vote [Braga Investment's] equity interest in Newco for so long as it own[ed] any equity interest in Newco" and

---

[24] Co-Investment Agreement § 1.

[25] *Id.* § 3. In the representations and warranties section of the Co-Investment Agreement, Braga Investment further represented that "It has had the opportunity to consult with advisors of its choice before making this investment." *Id* § 7.

[26] *Id.* § 4.

provided that the grant would "constitute an irrevocable power of attorney to do so at all meetings of equity holders and for any other purpose equity owners [were] called to vote or consent."[27] Braga Investment also represented in the Co-Investment Agreement that "It has the financial wherewithal to make [the] investment, is a sophisticated investor experienced in making such investments[,] and can afford the total loss of its investment."[28]

### C.     Braga Executes Signature Pages to the Operating Agreement

In addition to bringing Braga Investment into the deal, Yenni and the Fund were also negotiating revisions to some of the transaction documents, including the 2015 OA, to reflect changed deal terms.[29] Ricardo chose not to participate in these negotiations.[30]

To that end, on September 6, 2016, Yenni emailed lawyers at Dickinson Wright PLLC ("Dickinson Wright") regarding the Co-Investment Agreement and the Company's need for a revised operating agreement. Dickinson Wright represented Fifth Third Bank, which served as one of the Company's lenders.[31] Clint

---

[27] *Id.* § 5.

[28] *Id.* § 7. Braga Investment also represented that it "is an accredited investor as that term is defined under the Securities Act of 1933, as amended, and the rules promulgated by the Securities and Exchange Commission." *Id.*

[29] PTO ¶ 27.

[30] Tr. 126:1–127:24 (Ricardo).

[31] *Id.* 114:20–115:9 (Ricardo).

Gage of Dickinson Wright emailed Yenni stating, "The Co-Investment Agreement, subject to the revision re: the wire receipt, looks fine.[32] The email also indicated that the Dickinson Wright lawyers would "review the revised Operating Agreement upon receipt" from the Fund's lawyers at Dentons US LLP ("Dentons")."[33] Yenni forwarded this email chain to Ricardo and Rodrigo, giving them general wiring instructions for their investment and updates on the possible need to further update the Co-Investment Agreement.[34] Ricardo understood from the email chain, and "many other factors," that the Company's operating agreement would need to be revised.[35] That same day, Braga Investment signed an amendment to the Co-Investment Agreement which clarified that Braga Investment would be wiring its $700,000 investment to counsel for Fifth Third Bank, not Newco as originally planned.[36] On September 8, 2016, Ricardo signed the joinder agreement (the "Joinder Agreement") contemplated by the Co-Investment Agreement.[37] The Joinder Agreement provided that Braga Investment would be made a party to the Purchase Agreement and have all the rights and obligations of a "Buyer" as defined

---

[32] JX 6 at BRAGA00023949.

[33] *Id*.

[34] *Id.*

[35] Tr. 115:1–116:24 (Ricardo).

[36] JX 7 at BRAGA00034698.

[37] JX 8 at BRAGA00028963.

9

by the Purchase Agreement.[38] Yenni countersigned the Joinder Agreement on behalf of the Company at or around the September 19, 2016, closing date.[39]

### 1. The Dentons Invoice

On September 12, 2016, Dentons sent an invoice to Yenni for its work in revising documents to facilitate Braga Investment's participation in the deal, including the operating agreement.[40] The invoice is dated September 9, 2016, and contained two time entries for services performed on September 6 and 7, 2016.[41] The first narrative explained:

> Prepare letter agreement on a rush basis for Co-Investor to wire $700,000 to Newco or Fifth Third Bank and describe rights and obligations thereunder; review e-mail correspondence with counsel for the bank, Dickinson Wright; amend Co-Investment Agreement to provide for wire into attorney trust account; series of e-mails with Musa regarding wire and timing.[42]

The second narrative stated:

> Prepare revisions for Newco Operating Agreement to provide for capital account for Co-Investor, Board Advisory seat, Membership interest and power of attorney regarding voting agreement; review same with Musa and make revisions; review provisions of Purchase Agreement permitting co-investment; prepare Joinder Agreement for Co-Investor to be deemed a Buyer under the Purchase agreement; make revisions after Musa comments; call with Sellers' counsel regarding Co-Investor and non-dilution of Steve Feller indirect 20% ownership

---

[38] *Id.*

[39] PTO ¶ 25.

[40] JX 9 at BRAGA00016939.

[41] *Id.*

[42] *Id.*

10

and brief conference with tax department re: opening capital account amounts.[43]

Yenni forwarded the invoice to Ricardo and Rodrigo and asked them to pay it.[44] Rodrigo and Ricardo discussed the invoice.[45] As a result of these discussions, Ricardo understood that the invoice reflected that the lawyers had made changes to the 2015 Operating Agreement.[46] Braga Investment unsuccessfully tried to convince Yenni to pay half of the bill.[47] Conceding its obligation to pay, Braga Investment made payment in full to Dentons on September 14, 2016.[48]

The work described by the September 9, 2016, Dentons invoice reflected only part of the total changes to the operating agreement. On September 12, 2016, Dentons sent an email to Yenni about open issues and the desire to collect signature pages in advance of closing.[49] The email attached signature pages for Yenni and the Fund, which Yenni executed and returned within the next hour.[50] The email also

---

[43] *Id.*

[44] *Id.* at BRAGA00016939; Tr. 315:24–316:4 (Yenni).

[45] Tr. 124:1–16 (Ricardo).

[46] *Id.* 121:20–122:8 (Ricardo).

[47] *Id.* 262:15–51 (Rodrigo).

[48] PTO ¶ 28; JX 16 at BRAGA00011620.

[49] JX 13 at BRAGA00021648–49.

[50] *Id.* at BRAGA00021652.

noted an open issue concerning the operating agreement.[51]  Minutes later, Dentons sent Yenni another email attaching a signature page packet for Braga, which included signature pages for the operating agreement and a written consent related to Oldco's profit sharing plan.[52]  Recognizing that there were outstanding issues with the operating agreement, the Dentons email stated:  "We will need to receive Braga's signatures on these, though I note he should receive a final copy of the operating agreement he is signing when it is finished."[53]

The next morning, September 13, 2016, Yenni forwarded the September 12 Denton's email containing the signature packet to Ricardo, copying Rodrigo and several Dentons lawyers, asking Braga Investment to sign and return the signature pages "by no later than tomorrow."[54]  The attached signature page for the operating agreement differed from the form attached as Exhibit D to the Purchase Agreement, as it included a signature block for Braga Investment.[55]

On the afternoon of September 13, Dentons sent an email to Yenni indicating that its "negotiations with the lenders have led to a change to the signature page of

---

[51] *Id.* at BRAGA00021649 ("We will need additional signature(s) from you and any other mangers to a couple documents once you settle the operating agreement issue with Steve Feller.").

[52] JX 12 at BRAGA00030296.

[53] *Id.*

[54] *Id.*

[55] *Compare id.* at BRAGA00030299, *with* JX 2 at BRAGA00011249.

the operating agreement being necessary. Please see attached. You and Braga will have to sign where applicable."[56] Later that day, Yenni forwarded the email to Ricardo, writing: "I believe this will be the last page you need to sign before our close scheduled this Thursday."[57]

The new signature page contained additional signature blocks. Specifically, it added a signature block manifesting the signatories' consent to changes in Section 4.15 of the operating agreement, pertaining to Yenni Income Opportunities Fund GP, LLC's annual management fees.[58] Yenni's forwarding email also included a string of his communications with Dentons over the last two days, including emails that reflected the existence of the "manager issue" between Yenni and Steven Feller in the operating agreement, the fact that the issue had since been resolved, and the need to execute revised signature pages as a result of the negotiations with the lender.[59] Ricardo acknowledged receiving and likely reading this email chain, but he did not ask questions about it.[60]

On the afternoon of September 13, 2016, Ricardo executed and returned to Yenni the signature pages to the operating agreement, including the signature block

---

[56] JX 13 at BRAGA00021645.

[57] *Id.*

[58] *Id.* at BRAGA00021652.

[59] *Id.* at BRAGA00021645-49.

[60] Tr. 132:1–135:24 (Ricardo).

consenting to the changes in Section 4.15 of the operating agreement.[61] Ricardo did not inquire about any of the revisions generally or to Section 4.15 specifically, even after receiving notice of the change to Section 4.15.[62] Braga Investment also did not request a copy of the final version of the operating agreement before executing and returning the signature pages.

Shortly after Yenni sent the final, revised signature pages to Braga Investment on September 13, a Dentons lawyer forwarded an email to Yenni attaching a revised operating agreement and describing some of the changes.[63] The email also included a redline reflecting changes from a prior draft.[64] Among the changes were revisions to Yenni's voting and appointment authority. The following reflects revisions to two pertinent provisions in Section 3.1(b) (the "Contested Provisions"):

> (i) Yenni Income Opportunities Fund 1, L.P. ("~~"~~Yenni~~"~~") (or other investors as Yenni may designate), shall have the right to appoint four (4) members of the Board; the initial ~~members~~member of the Board appointed by Yenni shall be Musa Yenni ~~and Gregory Floyd~~ **who, in lieu of Yenni appointing any of the three (3) vacancies on the Board, shall have a supermajority vote for the purpose of calling all meetings, being counted toward a quorum at all meetings, consenting to all actions, and voting on all measures brought before the Board.** Yenni (or other investors as Yenni Fund may designate),

---

[61] JX 14 at BRAGA00031712–15.

[62] Tr. 137:1–138:14 (Ricardo). Ricardo testified that he did not check because "I trust my partner at this time." *Id.* 138:10–11 (Ricardo). Yenni and the Fund did not send a revised operating agreement along with the signature page or at any point before the Closing, nor did Braga Investment request one before Closing. PTO ¶ 30.

[63] JX 11 at YENNI0050204.

[64] *Id.*

14

may remove, recall and replace such members of the Board at will as it shall determine and shall always have the right to appoint four (4) members of the Board for so long as Yenni (or other investors as Yenni may designate) or their respective Affiliates is a controlling member of the Company. **In addition, Yenni shall have the right to invite (and/or remove) up to four (4) Board observers to any and all meetings of the Board who shall be entitled to receive Board packages at the same time as Board members. The initial Board observers so appointed are Parul Dubey, Ben Godbout, Wayne Kalayjian and Ricardo Braga**; and

(ii) Steven Feller shall become and remain a member of the Board of Managers for so long as Steven Feller is employed by the Company; *provided*, that, if Steven Feller shall no longer be a member of the Board, Yenni (or other investors as Yenni may designate) shall have the right to appoint all of the members of the Board.[65]

The Contested Provisions were not in the 2015 OA.[66] On September 14, Dentons sent another clean and redline version of the operating agreement to counsel for Fifth Third Bank with additional changes to section 4.15 and asked for confirmation that the changes were acceptable.[67] Yenni was copied on this email; Braga Investment was not.

Braga Investment's signature page was affixed to the final revised version of the operating agreement that was later included in the closing binder.[68] The parties refer to this version of the operating agreement as the 2016 Operating Agreement

---

[65] *Id.* at YENNI0050247–48. Bold formatting reflects additions while strike-through formatting reflects deletions.

[66] *Compare id.* at YENNI0050247–48, *with* JX 2 at BRAGA00011228–29.

[67] JX 15 at YENNI0050848.

[68] PTO ¶ 32.

15

(the "2016 Operating Agreement" or the "2016 OA").  Braga Investment did not see the 2016 Operating Agreement before May 15, 2019.[69]

### D.    The Closing and Post-Closing Events

On September 19, 2016, the transaction closed (the "Closing").[70]  Ricardo participated in the closing call, which included a discussion of the material terms of the transaction.[71]  On October 3, 2016, Rodrigo wrote to Parul Dubey of the Fund requesting the Closing documents, including the "final signed version of the Purchase Agreement by all parties."[72]

Dubey did not transmit to Braga Investment the final signed version of the Purchase Agreement or its exhibits in response to Rodrigo's email.  Rather, on October 21, 2016, Dubey sent Ricardo and Rodrigo a link to electronic data rooms that purported to contain "important shared files," the documents Rodrigo Braga had requested, and a marketing folder to be used for consolidating marketing materials.[73]  At some point, Yenni discontinued the data room.[74]

---

[69] Tr. 49:8–9 (Ricardo).

[70] *Id.* 314:1–3 (Yenni).

[71] *Id*. 146:11–15 (Ricardo).

[72] PTO ¶ 34.  Specifically, Rodrigo noted that they were missing "Final signed versions of both debt notes[;] Final signed version of the Purchase Agreement by all parties[;] Final signed version of the Joinder Agreement by all parties[;] Board observer agreements[; and] Any option pool contracts or warrants currently granted."  JX 20.

[73] JX 21 at YENNI0009846–47; Tr. 292:19–22 (Yenni).

[74] Tr. 245:7–12 (Rodrigo).

The only documentary evidence of the contents of the data room is a screenshot of an automated email sent from the data room service provider to Yenni. The screenshot reflects that Dubey uploaded documents to the data room on October 21, 2016.[75] The titles of these documents indicate that they were from November 2015, not September 2016.[76] For example, one document was titled "YENNI AND FELLER PURCHASE AGREEMENT WITH ALL EXHIBITS 23NOV2015.pdf."[77] The two other documents visible from this screenshot also had November 2015 dates in their titles.[78]

The Company held its first Board meeting on October 24, 2016.[79] Braga Investment attended the meeting as a Board observer.[80] At the meeting, the Board, consisting of Yenni and Steven Feller, ratified all matters related to the transaction for the Company without objection, including ratification of Steven Feller's selection as President and Board member and Yenni's selection as "Chair" of the

---

[75] JX 22 at YENNI0010537.

[76] *Id.* ("YENNI AND FELLER SIGNATURE PAGE OF PURCHASE AGREEMENT WITH FELLERS' SIGNATURES 22NOV2015.pdf"); *id.* ("YENNI AND FELLER SIGNATURE PAGE OF PURCHASE AGREEMENT WITH YENNI'S SIGNATURE 22NOV2015.pdf").

[77] *Id.*

[78] *Id.*

[79] PTO ¶ 36.

[80] *Id.*

Board.[81]  The Company's decision to retain Ricardo, Kalayjian, Dubey, and Godbout as Board observers was also ratified.[82]  Braga Investment has since attended and participated in every Company Board meeting, except for the January 2017 meeting, from which it was disinvited by the Board.[83]  From the Closing until April 2021, there had been only two Company Board managers:  Yenni and Steven Feller.[84]

### E.    The First Action

On May 22, 2017, Braga Investment filed a complaint (the "Main Lawsuit") against the Fund.  *See Braga Inv. & Advisory, LLC v. Yenni Income Opportunities Fund I, L.P.*, 2020 WL 3042236, at *1 (Del. Ch. June 8, 2020).  In the Main Lawsuit, Braga Investment alleged that the Fund breached the Purchase Agreement by agreeing to amend its terms shortly before the Closing to exclude certain assets from being transferred to Newco.  *Id.*  Braga Investment also alleged that the Fund breached the Co-Investment Agreement by depriving Braga of its rights as a Board observer to receive "board packages."  *Id.*

In a post-trial opinion, the court entered judgment in favor of the Fund and against Braga.  *Id.* at *19.  The court concluded that the "Joinder Agreement's purported modification to add Braga as a party to the Purchase Agreement [was]

---

[81] *Id.*

[82] *Id.*

[83] *Id.*

[84] *Id.*

facially invalid" because the Joinder Agreement was not signed by any of the parties that were required to effect an amendment to the Purchase Agreement. *Id.* at *9. Because Braga was not properly joined as a signatory to the Purchase Agreement, the Fund and the Sellers were permitted to amend the list of excluded assets to the Purchase Agreement without Braga's review or approval. *Id.* at *1. The court also determined that the Fund did not breach Braga's contractual right to receive "Board packages" under the Co-Investment Agreement. *Id*. at *16–19.

## F.     The Second Action

In September 2017, Yenni sought advancement for the Fund's legal fees to defend the Main Lawsuit.[85] Yenni retained Delaware counsel on behalf of the Company to render an opinion on the Fund's entitlement to advancement under the terms of the Company's operating agreement. In the process of preparing its opinion (the "Advancement Opinion"), counsel examined the unsigned 2015 OA, not the 2016 OA.[86]

On February 9, 2018, Braga Investment filed an action seeking declaratory judgment and injunctive relief to prevent the Fund from receiving indemnification or advancement (the "Second Action" and together with the Main Lawsuit, the

---

[85] PTO ¶ 39; *Braga Investment & Advisory, LLC v. Musa Yenni*, C.A. No. 2018-0093-LWW Dkt. 1 ¶ 28 (Del. Ch. Feb. 9, 2018).

[86] PTO ¶ 39.

"Related Actions").[87]  Plaintiff attached the unsigned 2015 OA to its complaint.[88] The case proceeded for months without the Fund or the Company raising any issue concerning the validity of the 2015 OA.[89]

It appears that the Company and Yenni were not focused on the issue in the context of the Second Action because the substantive language in the indemnification and advancement provisions were the same in both the 2015 OA and 2016 OA.[90]  Yenni realized the discrepancy in October 2018 and asked Dentons to send him an electronic version of the 2016 OA.  In his email to counsel, Yenni wrote that the discrepancy "created a problem in our lawsuits against Braga; the older version was filed in DE courts by the plaintiffs and we did not realize that until recently!  We are trying to rectify that."[91]

Most troubling is the fact that neither Yenni nor his counsel sought to correct the record at that time.  It was only months later, when the dispute arose over the proposed amendment to the operating agreement in May 2019 that Plaintiff learned

---

[87] *Id.* ¶ 40; *Braga Investment*, C.A. No. 2018-0093-LWW Dkt. 1.

[88] *Braga Investment*, C.A. No. 2018-0093-LWW Dkt. 1 Ex. A.

[89] PTO ¶ 41.  On September 28, 2018, the court denied Braga Investment's motion for judgment on the pleadings.  *Braga Investment*, C.A. No. 2018-0093-LWW Dkt. 84.  The Second Action is currently stayed but is subject to potential dismissal for prolonged inactivity.  *Id*. Dkts. 88 & 94.

[90] JX 2 at BRAGA00011230–31; JX 11 at YENNI0050211.

[91] JX 47.

of the issue—and only then by conducting its own redline comparison of the proposed amendment against the 2015 OA. Defendants conduct was irresponsible, and perhaps worse. But, as will be explained, this post-closing conduct does not establish that the 2015 OA was the Company's operating agreement, or that Defendants fraudulently induced Plaintiff to enter into the Co-Investment Agreement.

### G. Braga Investment Seeks a Larger Role

On January 25, 2018, Braga Investment, through its counsel, circulated to the Company, its Board, its Board observers, and its lenders, a proposed term sheet for Braga Investment to make a capital injection in the Company in return for, among other things, Braga Investment's right to appoint a Board member and that its consent be required for any change to the Company's corporate and organizational documents.[92] Yenni rejected Braga's proposal.[93]

### H. The Fund Engineers the Adoption of a Further Amended Operating Agreement in 2019

On May 12, 2019, Yenni emailed both Ricardo and Steven Feller about a potential refinancing of the Company's debt. Yenni indicated that the refinancing "requires an amendment to [the Company's] operating agreement and your

---

[92] *Id.* at BRAGA00026102.

[93] Tr. 215:16–216:4 (Ricardo).

signatures."[94]    The next day, Yenni sent Ricardo a draft amended operating agreement along with a redline.[95]    The redline highlighted changes between the proposed amended agreement and the 2016 Operating Agreement.[96]

When Ricardo reviewed the redline, he realized that it did not reflect all the differences between the newly proposed operating agreement and the 2015 OA, which was the only version that he possessed.  On May 14, 2019, Ricardo sent an email to Yenni, copying Steven Feller, accusing Yenni of bad faith and complaining that the redline did not capture what Ricardo perceived to be changes to Article 3 of the operating agreement.[97]    Yenni replied that "Article 3 was not amended at all" and accused Ricardo of making "false accusations."[98]

Ricardo responded to Yenni, copying Steven Feller, the other Board observers, and others, insisting that "the redline version [Yenni] sent out does not reflect the full changes made to the operating agreement."[99]    Ricardo attached a redline comparison of the proposed amended operating agreement against the 2015

---

[94] PTO ¶ 42; JX 48 at YENNIOA0001103.

[95] PTO ¶ 44; JX 49 at YENNIOA0003719.

[96] PTO ¶ 45.

[97] *Id.* ¶ 46; JX 50 at YENNIOA0000904–05.

[98] JX 51 at YENNIOA0001090.

[99] PTO ¶ 48; JX 52 at YENNIOA0002426.

Operating Agreement.[100] He also noted that Braga Investment had not approved the proposed amended operating agreement.[101]

On May 15, 2019, Yenni sent an email stating that he had confirmed with counsel that Yenni's original redline used the final executed version of the Company's operating agreement.[102] He attached a final execution version of the 2016 OA, which included Braga Investment's signature page.[103]

The Company proceeded to effect the amendments in a "First Amended and Restated Operating Agreement of Steven Feller P.E., LLC" signed by all of the managers and members of the Company (the "2019 OA").[104] Steven Feller signed in his capacity as a manager of the Company and as president of member Steven Feller P.E., PL.[105] Yenni signed in his capacity as a manager of the Company and on behalf of the Company as its executive chairman.[106] Midwest Mezzanine Fund V, LP, and Midwest Mezzanine Fund V SBIC, LP signed as preferred unit holders.[107] Yenni also signed as the authorized signatory for Braga Investment,

---

[100] *Id.* at YENNIOA0002430.

[101] *Id.* at YENNIOA0002426.

[102] PTO ¶ 49; JX 53 at YENNIOA0003154.

[103] PTO ¶ 49; JX 53 at YENNIOA0003185–87.

[104] JX 55 at YENNIOA0001184–6.

[105] *Id.* at YENNIOA00011185.

[106] *Id.* at YENNIOA00011184.

[107] *Id.* at YENNIOA00011186.

relying on the power of attorney in the Co-Investment Agreement.[108]  The Company

has been operating under the 2019 Operating Agreement since May 31, 2019.[109]

In April 2021, Steven Feller was terminated as a Company employee, thereby

disqualifying him as a manager.[110]  Since that time, Yenni has been the sole manager

on the Company's Board.[111]  Under the 2019 OA, Section 3.1 of that agreement

provides Yenni the right to appoint members to the Board, but Yenni has thus far

declined to exercise that right.[112]

## I.     This Action

On May 31, 2019, Braga Investment filed this action against Yenni and the

Fund, seeking an order declaring that the 2015 OA was the "valid and effective

operating agreement for the Company" and that the 2016 OA was not.  Plaintiff also

asserted a claim for breach of contract, alleging that the 2015 OA had been

purportedly amended by attaching Braga Investment's signature page to the 2016

OA without having obtained Braga Investment's approval under Section 11.1 of the

2015 OA.

[108] *Id.* at YENNIOA00011184.

[109] Tr. 220:13–22 (Ricardo).

[110] PTO ¶ 52.

[111] *Id.*

[112] JX 55 at YENNIOA0001157.

On February 25, 2020, this court denied Defendants' motion to dismiss this action.[113] Defendants later moved for summary judgment, and Plaintiff moved to amend and supplement the complaint to add parties and claims relating to the adoption of the 2019 OA.[114] On May 28, 2021, the court denied Defendants' motion for summary judgment and granted Plaintiff's motion to file a supplemental amended complaint (the "Amended Complaint").[115] The Amended Complaint asserts three counts. Count I seeks an order declaring that the 2015 OA is the valid and effective operating agreement for the Company and that the 2016 OA and 2019 OA are not.[116] Count II is a breach of contract claim alleging that Yenni and the Fund breached Section 11.1 of the 2015 Operating Agreement by affixing Braga Investment's signature page to the 2016 Operating Agreement.[117] Count III alleges the Defendants fraudulently induced Braga Investment into becoming a member of the Company by representing that the 2015 OA was the Company's operative operating agreement while concealing the differences between the 2015 OA and the 2016 OA.[118]

---

[113] Dkt. 23.

[114] Dkts. 31, 65, 122.

[115] Dkt. 95.

[116] Dkt. 96 ¶ 39.

[117] *Id.* ¶ 44–45.

[118] *Id.* ¶ 57. The Amended Complaint added the other members of the Company (Oldco, Midwest Mezzanine Fund V, LP, and Midwest Mezzanine Fund V SBIC, LP) as

On November 15, 2021, Plaintiff and Defendants cross-moved for summary judgment.[119] The court denied both motions on April 12, 2022.[120] The court held a two-day trial on October 12 and 14, 2022.[121]

Plaintiff seeks an order rescinding the Co-Investment Agreement, compelling the Defendants to return to Braga Investment its $700,000 investment, plus management payments made under the Co-Investment Agreement.[122] In the alternative, Plaintiff seeks damages and an order declaring the 2015 OA as the Company's operating agreement.[123] Defendants seek judgment in their favor and an award of their attorneys' fees and expenses under the terms of the Co-Investment Agreement.[124]

## II. ANALYSIS

To succeed at trial, Plaintiff must prove each element of its breach of contract claims against each Defendant by a preponderance of the evidence. *OptimisCorp.*

---

defendants in response to Defendants' argument that they were necessary parties. Plaintiff later agreed to dismiss them from the action after determining that they no longer owned membership interests in the Company. Dkt. 155.

[119] Dkts. 122–23.

[120] Dkts. 149–51.

[121] Dkt. 163.

[122] PTO ¶ 61.

[123] *Id.*

[124] *Id.* ¶ 58; Tr. 404:7–15 (Ricardo); *see* Co-Investment Agreement § 6 ("Co-Investor agrees to pay the expenses related to this Co-Investment Agreement.").

*v. Waite*, 2015 WL 5147038, at *55 (Del. Ch. Aug. 26, 2015), *aff'd*, 137 A.3d 970 (Del. 2016). This standard also applies to Plaintiff's claim for fraudulent inducement. *See In re IBP, Inc. S'holders Litig.*, 789 A.2d 14, 54 (Del. Ch. 2001); *Stone & Paper Invs., LLC v. Blanch*, 2021 WL 3240373, at *26 n.320 (Del. Ch. July 30, 2021). "'Proof by a preponderance of the evidence means proof that something is more likely than not. It means that certain evidence, when compared to the evidence opposed to it, has the more convincing force and makes you believe that something is more likely true than not.'" *Agilent Techs., Inc. v. Kirkland*, 2010 WL 610725, at *13 (Del. Ch. Feb. 18, 2010) (quoting *Del. Express Shuttle, Inc. v. Older*, 2002 WL 31458243, at *17 (Del. Ch. Oct. 23, 2002)).

## A. Fraudulent Inducement

In Count III, Plaintiff alleges Defendants fraudulently induced it into becoming a member of the Company by representing that the 2015 OA was the Company's operating agreement.[125] Plaintiff claims Defendants' conduct entitles Plaintiff to recission. "'If a party's manifestation of assent is induced by either a fraudulent or a material misrepresentation by the other party upon which the recipient is justified in relying, the contract is voidable by the recipient.'" *Lynch v. Gonzalez*, 2020 WL 4381604, at *35 (Del. Ch. July 31, 2020) (quoting Restatement (Second) of Contracts § 164 (1981)), *aff'd*, 253 A.3d 556 (Del. 2021)).

---

[125] Pl.'s Opening Br. 23 (Dkt. 168).

To prevail on a claim of fraudulent inducement, the plaintiff must prove:

> 1) a false representation, usually one of fact, made by the defendant; 2) the defendant's knowledge or belief that the representation was false, or was made with reckless indifference to the truth; 3) an intent to induce the plaintiff to act or to refrain from acting; [and] 4) the plaintiff's action or inaction taken in justifiable reliance upon the representation . . . .

*Lord v. Souder*, 748 A.2d 393, 402 (Del. 2000); *accord Standard Gen. L.P. v. Charney*, 2017 WL 6498063, at *12 (Del. Ch. Dec. 19, 2017), *aff'd,* 195 A.3d 16 (Del. 2018). Plaintiff frames its fraud claim as one of misrepresentation and omission. "[F]raud does not consist merely of overt misrepresentations, but may also occur through deliberate concealment of material facts, or by silence in the face of a duty to speak." *Martin v. Med-Dev Corp.*, 2015 WL 6472597, at *10 (Del. Ch. Oct. 27, 2015).

### 1. Did Defendants Make False Representations of Fact?

Plaintiff presents its fraud claim as being grounded in two misrepresentations and one omission. As to each alleged misrepresentation and omission, Plaintiff claims that Defendants represented that the 2015 OA was or would be the final operating agreement.

First, Plaintiff points to an August 26, 2016, email from Yenni to Braga Investments attaching the Purchase Agreement. That email stated, in its entirety:

> Here is the definitive purchase agreement we executed with the Seller in November both with and without all exhibits. The purchase agreement without the exhibits has the signatures of the parties. Please

28

note that Section 9 of the Operating Agreement (Exhibit D) addresses the issues of transfer of shares for all members. We could specify in our operating agreement that we would abide by this Exhibit D. We look forward to our likely partnership.[126]

At the time Yenni made this statement, the 2015 Operating Agreement had yet to be executed.[127] Yenni stated that they *could* specify that they would abide by the attached Exhibit D in the Co-Investment Agreement, but Yenni did not say that the attached Exhibit D would be the final operating agreement at closing. Plaintiff's assertion that Yenni's email represented that Exhibit D to the Purchase Agreement would be the final operating agreement is belied by the terms of Exhibit D itself.

The operating agreement attached as Exhibit D to the Purchase Agreement was not final. The Purchase Agreement referred to Exhibit D as the "proposed operating agreement."[128] Exhibit D was unsigned, and there is no evidence that it had been signed in that form.[129] It also made no reference to Braga Investment; yet there is no dispute that changes were necessary to reflect Plaintiff's investment.[130] The August 26 email from Yenni to Braga Investment was not a false statement of fact.

---

[126] JX 2 at BRAGA00011046.

[127] Tr. 83:20–84:1 (Ricardo).

[128] JX 2 at BRAGA00011177.

[129] *Id.* at BRAGA00011249–50.

[130] *Id.* at BRAGA00011177; Tr. 83:20–84:1 (Ricardo).

Next, Plaintiff points to the Co-Investment Agreement, which Braga Investment executed on September 2, 2016. Plaintiff asserts that Section 3 of that agreement represented that Exhibit D to the Purchase Agreement would be the final version of the Company's operating agreement at closing. Section 3 is titled "JOINDER," and states, in its entirety:

> Co-Investor has reviewed with its counsel, or has had the opportunity to do so, the diligence material made available to it by Newco and the Managing Investor and the [Purchase Agreement] and has agreed to enter into a so-called Joinder Agreement pursuant to which it shall be deemed to be a Buyer under the [Purchase Agreement] and will be entitled to all of the rights and subject to all of the obligations described in the [Purchase Agreement], including but not limited to the Operating Agreement of [the Company] and the other Exhibits referenced therein.[131]

This sentence contemplates that Braga Investment will enter into a Joinder Agreement, and under that agreement Braga Investment will be subject to the rights and obligations in the Purchase Agreement, including the "Operating Agreement . . . referenced therein."[132] The joinder paragraph of the Co-Investment Agreement refers to the form of operating agreement attached as Exhibit D to the Purchase Agreement. Exhibit D was, as explained above, a proposed operating agreement.[133] Neither the joinder paragraph of the Co-Investment Agreement, nor the Purchase

---

[131] Co-Investment Agreement § 3.

[132] *Id.*

[133] JX 2 at BRAGA00011177.

30

Agreement indicated that Exhibit D to the Purchase Agreement would be the final operating agreement. Read in context, the joinder paragraph of the Co-Investment Agreement represented that Plaintiff and the Company would enter into a Joinder Agreement, which in turn would give Plaintiff all of the rights associated with being a buyer under the Purchase Agreement. The final link in this chain of agreements is the Purchase Agreement. As previously explained, Exhibit D to the Purchase Agreement was only an unsigned, proposed operating agreement.[134] Thus, the Co-Investment Agreement did not represent that the final operating agreement would be the 2015 OA.[135]

Plaintiff frames the last misrepresentation as a form of omission, claiming that Defendants did not provide Plaintiff with a copy of the 2016 OA before seeking Braga Investment's signature. This argument reflects a slight pivot from Plaintiff's other arguments, as it focuses on Defendants' conduct leading up to Plaintiff's

---

[134] *Id.*

[135] Braga Investment and the Company entered into the Joinder Agreement six days later, on September 8, 2016. JX 8. That agreement did not explicitly mention the operating agreement that was attached as Exhibit D to the Purchase Agreement. Instead, it states, in pertinent part, that Braga Investment "shall have all of the rights and obligations of a 'Buyer' [under the Purchase Agreement] as if it had executed the Purchase Agreement." *Id.* In the Main Action, the court determined that the Joinder Agreement was invalid because it had not been executed by all the parties to the Purchase Agreement. *Braga Inv.*, 2020 WL 3042236, at *9. Again, Exhibit D was identified only as a proposed operating agreement that was negotiated in November 2015, long before Braga Investment emerged on the scene. It did not govern the Company before the closing of the transaction in September 2016. Tr. 300:3–6 (Yenni).

delivery of the executed signature pages to the operating agreement on September 12, 2016.[136] This argument fails, as it is merely a reformulation of the first two alleged misrepresentations as an omission.

In an arm's length setting like the negotiation of the Co-Investment Agreement and the execution of the operating agreement between Plaintiff and Defendants, the Defendants had no affirmative duty to speak. *Airborne Health, Inc. v. Squid Soap, LP*, 2010 WL 2836391, at *9 (Del. Ch. July 20, 2010). An affirmative duty to speak arises where there is a "fiduciary or other similar relation of trust and confidence between the parties." *Prairie Cap. III, L.P. v. Double E Hldg., Corp.*, 132 A.3d 35, 52 (Del. Ch. 2015). Plaintiff does not argue that Defendants owed a fiduciary duty or had some other similar relationship with Braga Investment giving rise to an affirmative duty to speak.

It is true, however, that "if a party in an arms' length negotiation chooses to speak, then it cannot lie. . . . And once the party speaks, it also cannot do so partially or obliquely such that what the party conveys becomes misleading." *Prairie Cap.*, 132 A.3d at 52. Plaintiff invokes this principle to argue that once Defendants spoke on the issue of the operating agreement generally, they had a "duty to disclose the 2016 OA and all differences between it and the 2015 OA."[137] Plaintiff's omission

---

[136] *See* Pl.'s Opening Br. 28.

[137] Pl.'s Reply Br. 8–9 (Dkt. 171).

32

argument essentially recasts the first two arguments of misrepresentation into one of omission. *See Prairie Cap.*, 132 A.3d at 52 ("[A]ny misrepresentation can be re-framed for pleading purposes as an omission.").

Defendants did not represent that the 2015 OA was going to be the final operating agreement for the Company at or before closing. Exhibit D was a proposed form of the operating agreement.[138] To the extent Defendants owed any duty to Plaintiff concerning the terms of the final operating agreement, they owed a duty not to misrepresent, conceal, or lie about what would be in the final version. In the days leading up to Plaintiff's execution of the signature page of the operating agreement, Defendants informed Plaintiff that the operating agreement was being revised.[139] Indeed, before Braga Investment signed the agreement, it saw an invoice from Dentons reflecting that the operating agreement had been revised.[140] Defendants represented that there were revisions to the operating agreement. At no time did the Defendants represent that the operating agreement contained the same terms as the 2015 OA. Nor did they represent that only certain provisions would be changed. Thus, Defendants did not lie to Braga Investment about the changes to the operating

---

[138] JX 2 at BRAGA00011177.

[139] JX 12 at BRAGA00030296.

[140] JX 9 at BRAGA00016939.

agreement or make representations that would mislead Plaintiff into believing that the final terms would be the same as in the 2015 OA.[141]

## 2. Plaintiff's Reliance on Any Representations Indicating that the 2015 OA Was the Final, Effective Operating Agreement Was Not Reasonable.

Even if Defendants had represented that the 2015 OA would be the final operating agreement for the Company, any reliance on those representations was not reasonable. Braga Investment knew that the 2015 OA would be revised before closing and would not be the final operating agreement, yet it never asked to see the final version before executing and returning the signature pages to the agreement. "Fraudulent inducement is not available as a defense when one had the opportunity to read the contract and by doing so could have discovered the misrepresentation." *Carrow v. Arnold*, 2006 WL 3289582, at \*11 (Del. Ch. Oct. 31, 2006) (citing 17A Am. Jur. 2d Contracts § 214 (2006)), *aff'd*, 933 A.2d 1249 (Del. 2007).

---

[141] For these reasons, Plaintiff's reliance on *Narrowstep, Inc. v. Onstream Media Corp.*, 2010 WL 5422405 (Del. Ch. Dec. 22, 2010), is misplaced. In that case, the court held, on a motion to dismiss, that the plaintiff successfully pleaded the false statement element of its fraud claims. *Id*. at \*12 ("Narrowstep alleges that Onstream made several false representations with respect to its communicated desire to close a merger with Narrowstep in an expeditious manner."). In so holding, the court observed that the complaint "sufficiently describe[d] the details" of an alleged misappropriation scheme, which in turn indicated that the false representations were made intentionally. *Id*. Here, the Plaintiff has not met its evidentiary burden to show that Defendants made a false representation that the 2015 OA would be the final version of the operating agreement.

All concerned parties knew on August 26, 2016, that the 2015 OA was not the final operating agreement. Braga Investment knew from the outset and up to the date that it executed and returned its signature page that changes to the operating agreement were necessary and had been made.

Braga Investment's notes, prepared in anticipation of its September 2, 2016, pre-investment call with Yenni, indicated that changes to the operating agreement would be discussed on the call.[142] Ricardo Braga knew when he executed the Co-Investment Agreement on September 2, 2016, that the 2015 OA was not the final version.[143] Thus, Braga Investment could not have reasonably relied on any representation on or before that date that the proposed operating agreement attached as Exhibit D to the Purchase Agreement would be the final version.

Plaintiff's return of the executed signature pages to the operating agreement on September 13, 2016, without having reviewed the agreement, further

---

[142] *See* JX 3 at BRAGA00000957 ("Outline of operating agreements, included in current one or just between Fund. Might go against operating agreements."). Braga Investment's notes also reflected that governance would be discussed, including Plaintiff's desire "to have a board seat." *Id.*

[143] Tr. 33:9–13 (Ricardo) (Q: "And you were aware that certain other changes needed to be made to the 2015 OA to reflect the terms of the deal; correct? A: Yes, I was expecting changes to reflect the co-investment."); *id.* 94:23–94:6 (Ricardo) (recognizing that the operating agreement needed to be revised to provide for board observers); *id.* 100:18–101:16 (Ricardo) (acknowledging based on his notes of September 2, 2016 that the management fee schedule in the 2015 OA needed to be revised to satisfy the lenders); *id.* 108:11–109:2 (Ricardo) (acknowledging that the 2015 OA did not yet accurately reflect the capitalization of the Company so as to include Braga Investment's ownership).

demonstrates unreasonable reliance. Ricardo knew that Dentons had made changes to the operating agreement before Plaintiff signed and returned the signature page.[144] Indeed, on September 14, 2016, Plaintiff saw the Dentons invoice reflecting that Dentons had made changes to the operating agreement.[145] Not only did Plaintiff see that invoice, but it also discussed the invoice with Yenni and then paid the invoice in full.[146] Plaintiff also knew, before executing and returning the signature pages to the operating agreement, that the agreement had been revised due to the resolution of the "manager issue" between Yenni and Steven Feller and the issues with Fifth Third Bank.[147]

Plaintiff's fraudulent inducement argument boils down to an assertion that Defendants' failure to provide Braga Investment with a copy of the 2016 OA when seeking Braga Investment's signature page constituted a misrepresentation or omission sufficient to give rise to fraudulent inducement. The court finds that Defendants did not conceal or misrepresent the terms or revisions of the operating

---

[144] Tr. 116:2–7 (Ricardo).

[145] *Id.* 124:20–126:5 (Ricardo). Braga Investment also knew from other emails on September 6, 2016, and "based on many other factors" that the operating agreement was being revised. *Id.* 115:1–116:24 (Ricardo).

[146] *Id.*; JX 16; PTO ¶ 28.

[147] JX 13; Tr. 132:12–134:7 (Ricardo); *see also* JX 12 at BRAGA00030296 (reproducing a September 12, 2016, email forwarded to Plaintiff on September 13, indicating the operating agreement had not been finalized).

agreement.[148]   Rather, Braga Investment knew that the agreement would be, and was, revised up until it executed and returned its signature pages.[149]   Under these circumstances, Braga Investment, a sophisticated investor, cannot rely on its own failure to request and read the final version of the operating agreement as grounds to rescind the Co-Investment Agreement or to invalidate the 2016 Operating Agreement.  *See Scion Breckenridge Managing Member, LLC v. ASB Allegiance Real Estate Fund*, 68 A.3d 665, 676–77 (Del. 2013) ("[A] failure to read bars a party from seeking to avoid or rescind a contract.").[150]

---

[148] As noted above, the Defendants behaved less than admirably when they learned that the wrong version of the operating agreement had been relied upon in the Second Action. Nevertheless, the court does not find that the Defendants sought to conceal the 2016 OA from the Plaintiff.

[149] JX 16; PTO ¶ 28.

[150] *See also Parke Bancorp Inc. v. 659 Chestnut LLC*, 217 A.3d 701, 711 (Del. 2019) ("When an experienced party does not bother to read what he knows will be the binding agreement, a court must be exceedingly careful before allowing him to escape the consequences of that agreement, lest the court undercut the reliability of all written contracts, a reliability critical to their important role in facilitating useful commercial relations."); *Graham v. State Farm Mut. Auto. Ins. Co.*, 565 A.2d 908, 913 (Del. 1989) ("[A] party's failure to read a contract [cannot] justify its avoidance."); *W. Willow–Bay Ct., LLC v. Robino–Bay Ct. Plaza, LLC*, 2009 WL 3247992, at *4 n.19 (Del. Ch. Oct. 6, 2009) ("'[F]ailure to read a contract provides no defense against enforcement of its provisions where the mistake sought to be avoided is unilateral and could have been deterred by the simple, prudent act of reading the contract.'" (quoting 27 Williston on Contracts § 70.113 (4th ed. 2009))), *aff'd*, 985 A.2d 391 (Del. 2009) (TABLE); *Patel v. Dimple, Inc.*, 2007 WL 2353155, at *11 n.22 (Del. Ch. Aug. 16, 2007) ("A party's failure to read a contract does not justify its avoidance."); *Moore v. O'Connor*, 2006 WL 2442027, at *4 (Del. Super. Aug. 23, 2006) ("Even if [defendant] was, in fact, unaware of the effect his initials on the June 30, 2006 agreement would have regarding the good will payment, he is still responsible for the contents of the writing to which he assented.  One of the basic tenets of contract law is that a party is responsible for the terms of a contract they sign, even if unaware of the terms."); *UBEO Hldgs., LLC v. Drakulic*, 2021 WL 1716966, at *10

Braga Investment could have protected its interest by refusing to execute and return the signature page, or alternatively, demanding that the signature pages be held in escrow until Plaintiff had an opportunity to review the final version. It chose neither path. Ultimately, Braga Investment's predicament is one of its own making and could easily have been avoided. The court will not unwind a transaction due to a sophisticated party's decision to sign an agreement without having read it.

(Del. Ch. Apr. 30, 2021) ("[I]f a party to a contract could use her failure to read a contract as a way to circumvent her obligations, contracts would not be worth the paper on which they are written." (quotations omitted)); *Harrington Raceway, Inc. v. Vautrin*, 2001 WL 1456873, at *3 (Del. Super. Aug. 31, 2001) ("[T]he Court cannot protect business people who decide to sign contracts . . . without reading them."); *TP Gp.–CI, Inc. v. Vetecnik*, 2016 WL 5864030, at *1 (D. Del. Oct. 6, 2016) ("The law is well settled . . . that failure to read a contract does not excuse performance."); *Hollinger Int'l v. Black*, 844 A.2d 1022, 1065–66 n.95 (Del. Ch. 2004) ("Succinctly put, a party will not be heard to complain that he has been defrauded when it is his own evident lack of due care which is responsible for his predicament."). Other jurisdictions are in accord. *See, e.g.*, *Dasz, Inc. v. Meritocracy Ventures, Ltd.*, 969 N.Y.S.2d 653, 655 (N.Y. App. Div. 2013) ("[A] signer's duty to read and understand that which it signed is not diminished merely because [the signer] was provided with only a signature page." (second alteration in original) (quoting *Vulcan Power Co. v. Munson*, 932 N.Y.S.2d 68, 69 (N.Y. App. Div. 2011))); *McBroom v. Child*, 392 P.3d 835, 842 (Utah 2016) (holding that the plaintiff's duty to inquire into the terms of her agreement was not diminished because she only received the signature page as that page was clearly not a self-contained document); *Parks v. Parks*, 2013 WL 4478189, at *4 (Ohio Ct. App. Aug. 14, 2013) ("[I]f appellants had questions of what they were signing they could have refused to sign it; or alternatively, they could have asked to see the entire document before they signed it."); *Allied Office Supplies Inc. v. Lewandowski*, 261 F. Supp. 2d 107, 112–13 (D. Conn. 2003) (explaining the general rule that a person who signs a written contract has a duty to read it and that the general rule "presupposes either that the alleged breaching party was provided with the entirety of the allegedly breached agreement . . . or that because the signature pages made explicit reference to an agreement, defendants were put under a derivative duty of inquiry into the contents of the referenced writing" (applying Connecticut law)); *Friedman v. Fife*, 262 A.D.2d 167, 168 (N.Y. App. Div. 1999) ("Plaintiff will not be heard to claim that he received only a signature page for the stock restriction agreement, since he was bound to know and read what he signed.").

Because Plaintiff did not prove the first two elements of its fraud claim, the court need not address the other elements, including whether Plaintiff has established a right to rescind the Co-Investment Agreement.

## B. Breach of Contract

Plaintiff sought to prove two claims for breach of contract relating to the adoption and amendment of the Company's operating agreement. First, Braga Investment contends that Defendants breached Section 11.1 of the 2015 OA by failing to obtain Plaintiff's approval to adopt the 2016 OA. Second Braga Investment maintains that Defendants breached the 2015 OA when it signed Braga Investment's signature to the 2019 OA using the power of attorney in the Co-Investment Agreement.

Under Delaware law, Plaintiff must establish the following to succeed on a breach of contract claim: "(1) the existence of a contract, whether express or implied; (2) breach of one or more of the contract's obligations; and (3) damages resulting from the breach." *GEICO Gen. Ins. Co. v. Green*, 276 A.3d 462, at *5 (Del. 2022) (TABLE).

### 1. Plaintiff Did Not Prove a Breach of the Amendment Provision of the 2015 OA.

Section 11.1 of the 2015 OA provides that it "may be amended only upon unanimous approval of all Members."[151]  Under Delaware law, only parties to a contract and intended third-party beneficiaries have standing to sue for breach of the contract. *Arkansas Tchr. Ret. Sys. v. Alon USA Energy, Inc.*, 2019 WL 2714331, at *10 (Del. Ch. June 28, 2019).  The 2015 OA was never signed or implemented by the members of the Company.[152]  But even if it had been, the Plaintiff was never a party or third-party beneficiary of the 2015 Operating Agreement.  Plaintiff became a member of the Company "post-closing."[153]  Closing occurred on September 19, 2016, the date of the 2016 OA.[154]  Thus, Plaintiff lacks standing to assert any claims under the 2015 OA.

Recognizing its lack of standing to assert a direct breach of contract claim under the 2015 OA, Plaintiff argues that "based on Defendants' intentional concealment of the 2016 OA, they are estopped from asserting its existence."[155] Plaintiff did not satisfy the high burden necessary to support this theory.

---

[151] JX 2 at BRAGA00011246.

[152] Tr. 300:3–6 (Yenni).

[153] PTO ¶ 26.

[154] JX 18 at YENNI0046682.

[155]Pl.'s Opening Br. 30.

"[E]stoppel may arise when a party by his conduct intentionally or unintentionally leads another, in reliance upon that conduct, to change position to his detriment." *Wilson v. Am. Ins. Co.*, 209 A.2d 902, 903–04 (Del. 1965). The party claiming estoppel must demonstrate that: "(i) they lacked knowledge or the means of obtaining knowledge of the truth of the facts in question; (ii) they reasonably relied on the conduct of the party against whom estoppel is claimed; and (iii) they suffered a prejudicial change of position as a result of their reliance." *Nevins v. Bryan*, 885 A.2d 233, 249 (Del. Ch. 2005), *aff'd*, 884 A.2d 512 (Del. 2005). "Regardless of the form of the action, the burden of proof of estoppel rests upon the party asserting it. Furthermore, equitable estoppel must be proven by clear and convincing evidence . . . ." *Id.*

As discussed above, Braga Investment did not lack the means of obtaining the terms of the 2016 OA before it became a member of the Company. Defendants did not conceal the terms of the 2016 OA. Rather, Plaintiff did not ask to see it before executing and delivering its signature page. Plaintiff also cannot argue that it could reasonably rely on Defendants' conduct as a representation that there would be no material changes to the 2015 Operating Agreement.[156] Braga Investment knew when it signed the Co-Investment Agreement that there were going to be changes to the

---

[156] Yenni testified that he kept Braga Investment informed of negotiations over the Operating Agreement in numerous phone calls. Tr. 310:4–312:24 (Yenni).

operating agreement, and it knew changes had been made up to the time it returned its executed signature page. Thus, Plaintiff has fallen far short of presenting clear and convincing evidence that it lacked the means of learning that the 2015 OA would not be the final operating agreement or that it could reasonably rely on Defendants' conduct as indicating otherwise.[157] Accordingly, Defendants are not estopped to assert the existence of the 2016 Operating Agreement. Plaintiff's claim for breach of the 2015 Operating Agreement fails for a lack of standing.[158] Accordingly, as of the Closing, the 2016 OA was the Company's duly approved operating agreement.

### 2. Plaintiff Did Not Establish that the Adoption of the 2019 OA Breached the Operating Agreement.

Plaintiff contends that the adoption of the 2019 OA breached Section 11.1 of the operating agreement, which requires "unanimous approval of all Members" for

---

[157] Plaintiff's reliance on *Nevins* is misplaced. In *Nevins*, the court found, after trial, that the plaintiff was estopped to contest the appointment of directors that he held out as board members after having executed a written consent appointing them. *Nevins*, 885 A.2d at 249. Although the consent was determined to be defective, the appointed directors had no reason to question its validity and it was reasonable for the new directors to rely on the plaintiff's assertions that they were valid directors. *Id*. at 249–50. Here, by contrast, Defendants did not affirmatively represent to Plaintiff that the unexecuted 2015 OA was or would be the final version of the Company's operating agreement. The confusion over the valid operating agreement that arose in the Second Action does not make it reasonable for Plaintiff to assume that the 2015 OA was the operative agreement, particularly when Plaintiff knew that it had been under revision before closing and declined to request a copy before executing the signature pages to the 2016 OA.

[158] Braga Investment's requested alternative relief for an order declaring the 2015 OA as the Company's "valid and effective" operating agreement fails for same reason. PTO ¶ 61. The 2015 Operating Agreement was an unsigned, undated, proposed operating agreement that was never implemented. Tr. 300:3–6 (Yenni).

any amendment.[159]  Plaintiff maintains that it did not approve the amendment, and the Fund's signing the amendment on behalf of Braga Investment under the purported authority of the power of attorney in the Co-Investment Agreement was invalid.

The 2019 OA is dated May 31, 2019.[160]  Steven Feller signed in his capacity as a manager of the Company and as president of member Steven Feller P.E., PL. Yenni signed in his capacity as a manager of the Company and on behalf of the Company as its executive chairman.  Midwest Mezzanine Fund V, LP, and Midwest Mezzanine Fund V SBIC, LP signed as preferred unit holders.[161]  Yenni also signed the 2019 OA on Braga Investment's behalf, as its "authorized signatory."[162]

The power of attorney gives the Fund:  "The right to vote [Braga Investment's] equity interest in [the Company] at all meetings of equity holders and for any other purpose equity owners are called to vote or consent."[163]  This broad, open-ended language reflects the parties' agreement that the Fund has an irrevocable proxy to vote Braga Investment's equity interest in the Company.  *See Eliason v.*

---

[159] This provision is the same in the 2015 OA and 2016 OA.  *See* 2015 OA § 11.1; 2016 OA § 11.1.

[160] JX 55 at YENNIOA0001155.

[161] PTO ¶ 50.

[162] *Id.* ¶ 51; JX 55 at YENNIOA0001184.

[163] JX 55 at YENNIOA0001184.

43

*Englehart*, 733 A.2d 944, 946 (Del. 1999) ("A proxy is evidence of an agent's authority to vote shares owned by another." (citations omitted)).  Plaintiff does not contest the validity of the power of attorney or the irrevocable authority that it gives to the Fund to vote Braga Investment's membership interest in the Company.[164] Rather, Plaintiff argues that it does not extend to amending the operating agreement, which requires unanimous member approval.[165]

Powers of attorney are construed following the standard rules for the interpretation of written instruments. *Realty Growth Inv. v. Council of Unit Owners*, 453 A.2d 450, 454 (Del. 1982); *see also Daniel v. Hawkins*, 289 A.3d 631, 645 (Del. 2022) (interpreting an irrevocable proxy).  "When interpreting a contract, the role of a court is to effectuate the parties' intent." *Lorillard Tobacco Co. v. Am. Legacy Found.*, 903 A.2d 728, 739 (Del. 2006).  "If a writing is plain and clear on its face, *i.e.*, its language conveys an unmistakable meaning, the writing itself is the sole source for gaining an understanding of intent." *City Investing Co. Liquidating Tr. v. Cont'l Cas. Co.*, 624 A.2d 1191, 1198 (Del. 1993).  When the language of a "contract is clear and unequivocal, a party will be bound by its plain meaning because creating

---

[164] Tr. 23:6–14 (Ricardo) ("[W]e gave power of attorney for the Fund to vote our equity interest. . . .  We agreed with that at this time because if you look [at the ownership interests of the members], we are going to be minority, so meaning that any vote we are going to end up, regardless, we want to approve, approve getting our -- our approval being lost.").

[165] Pl.'s Opening Br. 29, 34–35.

an ambiguity where none exists could, in effect, create a new contract with rights, liabilities and duties to which the parties had not assented." *Hallowell v. State Farm Mut. Auto. Ins. Co.*, 443 A.2d 925, 926 (Del. 1982). "The presumption that the parties are bound by the language of the agreement they negotiated applies with even greater force when the parties are sophisticated entities that have engaged in arms-length negotiations." *W. Willow-Bay Ct., LLC*, 2007 WL 3317551, at *9.

Powers of attorney and irrevocable proxies are "strictly construed." *Daniel*, 289 A.3d at 645; *see Dorman v. Plummer*, 2001 WL 32645, at *6 (Del. Ch. Jan. 9, 2001) ("Powers of attorney[, however,] are construed narrowly in favor of the principal."). Therefore, any ambiguity will be construed against the Fund. *Daniel*, 289 A.3d at 645 ("Where the irrevocable proxy is ambiguous, the ambiguity will be construed against the rights of the proxy holder.").

Plaintiff argues the Fund's authority under the power of attorney "only applies to votes taken at member meetings and consents obtained in lieu of member meetings. It does not allow [the Fund] to sign agreements delineating Braga Investment's rights and entitlements on Braga Investment's behalf."[166] The distinction that Plaintiff draws is not found in the Co-Investment Agreement. The Fund's authority under the power of attorney is not limited to votes taken at a

---

[166] Post-Trial Arg. Tr. 25:5–13; *id.* 24:14–28 (Dkt. 174); *see also see also* Pl.'s Reply Br. 22 ("[T]he power of attorney applies only to votes taken at member meetings and consents obtained in lieu of member meetings.").

45

meeting of the members or written consents in lieu of a meeting. It extends to "any other purpose equity owners are called to vote or consent."[167] Consent means "agreement, approval, or permission regarding some act or purpose." *Black's Law Dictionary* 11th ed. 2019); *see also Merriam-Webster Dictionary* (defining consent as "to give assent or approval").[168] Plaintiff's interpretation of the power of attorney as applying only to member meetings or formal written consents in lieu of a meeting is an overly cramped construction that asks the court to supply words that do not appear in the contract. *See Murfey v. WHC Ventures, LLC*, 236 A.3d 337, 356 (Del. 2020) ("[I]t is axiomatic that courts cannot rewrite contracts or supply omitted provisions.").[169]

The operating agreement may be amended "upon unanimous approval of the Members."[170] The 2019 Amendment was a matter upon which the members were asked to approve. The Fund's signature on the 2019 OA on behalf of Braga

---

[167] Co-Investment Agreement § 5.

[168] *Consent*, Merriam-Webster, https://www.merriam-webster.com/dictionary/consent (last visited May 27, 2023).

[169] Plaintiff does not take issue with any of the amended terms added in 2019 that were not already in the 2016 OA. Rather, it objects to Section 3.1, which is unchanged from the 2016 OA. Plaintiff argues that allowing the power of attorney to extend to amendments to the operating agreement would theoretically allow the Fund to eliminate Plaintiff's ownership interest. Pl.'s Opening Br. 35. But that issue is not before the court, and Defendants admit that any exercise of the power of attorney would be subject to "the fiduciary duties imposed on LLC managers as well as agents exercising a power of attorney, to which Yenni attested." Defs.' Ans. Br. 58 (Dkt. 170).

[170] Co-Investment Agreement § 5.

Investment was a manifestation of the consent authority granted under the Co-Investment Agreement to approve the amendment.

Finally, Braga Investment argues that Yenni knew it could not use the power of attorney to effect an amendment to the operating agreement because he stated that Plaintiff's approval was required.[171] Yenni's request for member signatures to amend the operating agreement does not change the unambiguous language of the contract, which is an issue of law for the court to decide. As Chancellor Bouchard noted in the Main Action when presented with a similar argument concerning the interpretation of the Joinder Agreement: "The legal effect of the Joinder Agreement, however, is an issue for the court to decide irrespective of whatever subjective belief the Fund or Braga may have had about its meaning." *Braga Inv.*, 2020 WL 3042236, at *10. Yenni's request for member signatures to amend the operating agreement does not alter the plain meaning of the power of attorney. Accordingly, Plaintiff has failed to meet its burden to invalidate the 2019 OA.

## C.    Defendants' Request for Attorney's Fees

Defendants seek an order compelling Plaintiff to pay Defendants' attorneys' fees. Under the American Rule and Delaware law, litigants are ordinarily responsible for their own litigation expenses. *Mahani v. Edix Media Grp., Inc.*, 925 A.2d 242, 245 (Del. 2007). There is an exception to the general rule when a contract

---

[171] Pl.'s Opening Br. 34; JX 48 at YENNIOA0001101.

contains an express fee-shifting provision. *Id.* Defendants claim entitlement to their fees and expenses under one sentence in Section 6 of the Co-Investment Agreement, which states: "Co-Investor agrees to pay the expenses related to this Co-Investment Agreement."[172] In the Main Action between these parties, the court denied the Fund's application for attorneys' fees under this provision. Chancellor Bouchard denied the request because the Fund had not been raised before entry of the final judgment. Nevertheless, the Chancellor observed that this provision:

> does not even mention attorneys' fees and, on its face, does not appear to be a fee-shifting provision. Rather, the provision appears in a section of the agreement describing the "economics" of the investment Braga made through the Fund (*i.e.*, that Braga would pay the Fund annual fees and a success fee) and provides simply that: "Co-Investor agrees to pay the expenses related to this co-investment.[173]

Defendants are not entitled to an award of attorneys' fees and expenses under the quoted language from Section 6 of the Co-Investment Agreement. "A fee-shifting provision must be a clear and unequivocal agreement triggered by a dispute over a party's failure to fulfill obligations under the contract. It must include specific language, such as any reference to prevailing parties, a hallmark term of fee-shifting provisions." *Murfey v. WHC Ventures, LLC*, 2022 WL 214741, at *2 (Del. Ch. Jan.

---

[172] Co-Investment Agreement § 6.

[173] *Braga Inv. & Advisory, LLC v. Yenni Income Opportunities Fund I, L.P.*, 2020 WL 5416516, at *3 (Del. Ch. Sept. 8, 2020).

25, 2022) (cleaned up). Section 6 of the Co-Investment Agreement contains none of the aforementioned language.

Defendants' reliance on *SIGA Technologies, Inc. v. PharmAhtene, Inc.*, 67 A.3d 330 (Del. 2013), is misplaced. In that case, the Delaware Supreme Court affirmed the trial court's awarding of attorneys' fees based on the construction of two separate provisions of the contract. One provision required SIGA to pay all costs and other expenses incurred by PharmAthene in connection with its performance of the agreement. The second required SIGA to "defend, indemnify, and hold harmless PharmAthene from expenses of whatever kind or nature, (including, without limitation, counsel and consultant fees and expenses) that in any way relate to SIGA's breach of any covenants." *Id*. at 352 n.108 (cleaned up).

Unlike in PharmAthene, the Co-Investment Agreement does not make any reference to Braga Investment having to indemnify, defend, or hold the Fund harmless, nor does it mention litigation or fee-shifting. And unlike in PharmAthene, the Co-Investment Agreement does not mention any right to attorneys' fees in the event of a breach of the agreement. Nor is there any claim in this case that Braga Investment has breached the Co-Investment Agreement.

Section 6 of the Co-Investment Agreement is not a clear and unequivocal fee-shifting provision. Accordingly, Defendants' application for attorneys' fees is denied.

49

## III. CONCLUSION

For the foregoing reasons, Plaintiff has failed to prove its claims. Judgment is entered in favor of Defendants. Defendants' claim for attorneys' fees is denied.